GUILIO J. AND EDITH CONTI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 15131-90.     Filed September 29, 1992.

*Mark C. Pierce, Robert B. Pierce,* and *Paul T. Mengel,* for petitioners.

*Dennis C. Driscoll,* for respondent.

COLVIN, *Judge:* This case is before us on petitioners' offer into evidence of results of polygraph tests and respondent's objection thereto. Both parties called expert witnesses relating to whether polygraphy is generally accepted by the relevant scientific community. *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923).[1] Admission of the polygraph examination results was taken under advisement to permit briefing by the parties.

Respondent determined deficiencies of $116,410.57 for 1986 and $390,227.28 for 1987, and additions to tax for fraud under section 6653(b) and substantial understatement of income tax under section 6661.

---

[1] This Court has not previously considered the admissibility of polygraph examination results where taxpayers have attempted to show that they meet the criteria in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). In *Malandro v. Commissioner,* T.C. Memo. 1989-135, the taxpayer did not present any evidence showing whether polygraphy was generally accepted by the relevant scientific community. In *Rossmann v. Commissioner,* T.C. Memo. 1984-231, we ruled that certain testimony and documentary evidence regarding a polygraph test administered to the taxpayers was inadmissible. In *Grosshandler v. Commissioner,* 75 T.C. 1, 14-17 (1980), we noted that hypnosis was like polygraphy. In *Parker v. Commissioner,* T.C. Memo. 1976-225, we considered the admissibility of a polygraph examination. However, we found the issue to be moot because we found the taxpayer to be a credible witness. In several other cases, polygraphy was mentioned, but admissibility of examination results was not an issue. E.g., *National Home Products, Inc. v. Commissioner,* 71 T.C. 501 (1979) (conspirators refused to take polygraph tests); *Barrier v. Commissioner,* T.C. Memo. 1983-258 (taxpayer claimed a polygraph examination was given to an employee accused of embezzling from taxpayer); *Estate of Vella v. Commissioner,* T.C. Memo. 1982-73 (polygraph test was administered to a witness); *Reno Turf Club, Inc. v. Commissioner,* T.C. Memo. 1979-381 (polygraph of employees).

Respondent determined petitioners had a $150,000 cash hoard as of December 31, 1985. Petitioners claim that the results of polygraph tests administered to each of them corroborate their claim that they had an $800,000 cash hoard.

In this opinion we decide whether the results of polygraph tests administered to petitioners without notice to respondent are admissible. We hold they are not. We will decide the remaining issues in the case by separate opinion.

Unless otherwise indicated, all section references are to the Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

### 1. *Petitioners and Their Family*

Petitioners are husband and wife who resided in Birmingham, Michigan, when the petition was filed. Mr. Conti worked for Ford Motor Co. for over 48 years, retiring in 1985. Mrs. Conti is a high school graduate. She handled the family finances, including banking. During the years in issue, petitioners bought, renovated, and sold real estate.

### 2. *Polygraphy Generally*

Petitioners offered into evidence results of polygraph examinations in an attempt to corroborate their cash hoard claim. A polygraph examination measures the examinee's physiological reactions to questions. It measures respiration, perspiration, and heartbeat. The polygraph instrument has a pneumograph, which measures respiration, a galvanometer, which measures skin's resistance to electricity, and a cardiosphygmograph, which measures a combination of blood volume, blood pressure, and heart rate.

Respiration is recorded using two rubber tubes around the upper and lower body. Respiration is measured on both the upper and lower body because people breathe differently. Resistance to electricity in the skin is measured by placing electrodes on two finger tips and passing a small electrical

current through the fingers. Cardiovascular activity is measured by using a blood pressure cuff.

These measures are simultaneously recorded by pens on a moving paper chart. The examiner marks the chart to indicate when a question has been asked, and when movements such as coughs occur. The respiratory, galvanic, and cardiovascular scores are combined with the three measures and weighted equally.

The polygraph examiner designs the questions based upon the relevant facts and the examinee's background and verbal skills.

Examiners in tests like the ones given to petitioners use three types of questions: irrelevant (e.g., name), control (relating to the subject of the examination, but not the key question), and relevant or critical questions (e.g., did you rob the store?). The polygraph examiner infers from the scores whether the examinee was deceptive or truthful, or whether the test is inconclusive.

Countermeasures can sometimes be employed by an examinee to affect the examinee's physiological responses to polygraph examination questions. Up to 25 percent of deceptive persons pass, and up to 50 percent of truthful persons fail. An honest subject is more likely to fail (a false positive) than a deceptive person is to pass (a false negative).

There is widespread use of polygraph examinations in and out of government.

### 3. *Petitioners' Polygraph Examinations*

Without notifying respondent's counsel, petitioners' counsel arranged for petitioners to take polygraph examinations. They were performed by Lawrence Wasser of Wasser Consulting Services, Inc., on August 6, 1990.

Mr. Wasser is a well-qualified polygraph examiner. He has extensive polygraph-related employment experience in and out of government and numerous leadership positions in national and State polygraphy associations.

Petitioners' counsel told Mr. Wasser about this case and gave him copies of petitioners' tax returns for 1985, 1986, and 1987, the notice of deficiency, and the petition.

Mr. Wasser used the zone comparison technique with control questions. He conducted preexamination interview discussions with petitioners, and then developed the control

and relevant questions. He discussed the topics of the control questions with petitioners.

Mr. Wasser concluded that the examinations showed both petitioners were not deceptive. After Mr. Wasser advised petitioners' counsel of his conclusion, petitioners' counsel told respondent's counsel that the examinations had been performed, and showed that petitioners were not being deceptive.

## OPINION

To corroborate their cash hoard claim, petitioners offered into evidence the results of polygraph examinations which were administered to them unilaterally, without prior notification to respondent. We hold that these polygraph examination results are inadmissible.

1. *Federal Rules of Evidence and the Frye General Acceptance Standard*

Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Thus, "Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue." *Parker v. Commissioner,* 86 T.C. 547, 561 (1986).

This Court applies the rules of evidence applicable in trials without jury in the U.S. District Court for the District of Columbia. Sec. 7453. These include the Federal Rules of Evidence. *Snyder v. Commissioner,* 93 T.C. 529, 531 (1989). Consequently, we follow precedents of the U.S. Court of Appeals for the District of Columbia in interpreting the Federal Rules of Evidence. See *Logan Square Auto Mart, Inc. v. Commissioner,* 291 F.2d 136 (7th Cir. 1961), affg. T.C. Memo. 1960-6. However, as discussed below, petitioners' polygraph examinations would not be admissible under precedents of the U.S. Court of Appeals for the District of Columbia, or the Sixth Circuit, the circuit to which this case is appealable.

In the Court of Appeals for the District of Columbia a scientific test must be generally accepted in the particular field

in which it belongs to be admissible. *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). In *Frye,* a murder prosecution, the court refused to admit results of a systolic blood pressure test, a precursor to the polygraph test. The court stated:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs. [*Frye v. United States, supra* at 1014.]

We disagree with petitioners' assertion that the standard enunciated in *Frye v. United States, supra,* should be rejected because it is outdated. The Court of Appeals for the District of Columbia and the Court of Appeals for the Sixth Circuit continue to apply the *Frye* standard of general acceptance in the relevant scientific community for admission of scientific evidence. *Novak v. United States,* 865 F.2d 718, 722 (6th Cir. 1989); *United States v. Shorter,* 809 F.2d 54, 59-61 (D.C. Cir. 1987); *United States v. Brady,* 595 F.2d 359, 362-363 (6th Cir. 1979); *United States v. Brown,* 557 F.2d 541, 556 (6th Cir. 1977); *United States v. Addison,* 498 F.2d 741, 743 (D.C. Cir. 1974); *United States v. Stifel,* 433 F.2d 431, 438, 441 (6th Cir. 1970). The *Frye* requirement of general acceptance in the relevant scientific field assures that those most qualified to assess the general validity and reliability of a scientific method have the determinative voice.[2] *United States v. Shorter, supra* at 60; *United States v. Addison, supra* at 744.

We applied the *Frye* standard in *Pacella v. Commissioner,* 78 T.C. 604, 613-617 (1982). In that case respondent sought to introduce evidence that ink analysis showed the ink used was not manufactured when allegedly used by petitioner. We held that ink analysis did not meet the *Frye* standard.

The court in *United States v. Bursten,* 560 F.2d 779, 785 (7th Cir. 1977), identified factors which Federal courts have considered in rejecting polygraph evidence:

---

[2] We do not reject the *Frye* standard as in *United States v. Piccinonna,* 885 F.2d 1529, 1531-1532 (11th Cir. 1989).

Among these are the distrust of the accuracy of results based upon a nexus between autonomic discharge and veracity, this skepticism being fueled by disagreement among experts in the field. Also, judges loathe the spector [sic] of trial by machine, wherein each man's sworn testimony may be put to the electronic test. Finally, there exists the apprehension that jurors will abdicate their responsibility for determining credibility, and rely instead upon the assessment of a machine.

The proponent must show that the techniques or procedures involved are "reliable and sufficiently accurate." *United States v. Brown, supra* at 556. Absolute certainty is not required for admissibility of polygraph results, nor is it necessary that there be a consensus or unanimity in the appropriate scientific community. *Peteet v. Dow Chemical Co.,* 868 F.2d 1428, 1433 (5th Cir. 1989); *United States v. Brown, supra.* The acceptance of a technique or process in the scientific community is synonymous with its reliability. *United States v. Franks,* 511 F.2d 25, 33 n.12 (6th Cir. 1975).

Deciding credibility of witnesses and weight of testimony is the province of the trial court. It is our task to decide the credibility of any lay or expert witness based upon objective facts, the reasonableness of the testimony, the consistency of the statements made by the witness, and, in some cases, the demeanor of the witness. *Quock Ting v. United States,* 140 U.S. 417, 420-421 (1891); *Wood v. Commissioner,* 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); *Pinder v. United States,* 330 F.2d 119, 124-125 (5th Cir. 1964); *Concord Consumers Housing Cooperative v. Commissioner,* 89 T.C. 105, 124 n.21 (1987). We recently considered whether expert opinion is useful or helpful for deciding a witness' propensity for truthfulness and veracity; we held it was not. *Friedman v. Commissioner,* T.C. Memo. 1992-89.

Petitioners assert that evidence of general acceptance in the appropriate scientific community may be found in a 1983 Gallup organization survey of a random sample of members of the Society for Psychophysiological Research. Sixty percent of those responding to the survey believed polygraph testing is a useful diagnostic tool when considered with other available information. This poll does not prove general acceptance in the appropriate scientific community as required by *Frye. Dowd v. Calabrese,* 585 F. Supp. 430, 432-433 (D.D.C. 1984) (rejecting use of this 1983 poll to show general acceptability). The poll was commissioned in an attempt to support admis-

sion of polygraph results into evidence in the District of Columbia. About two-thirds of those polled had not used polygraph tests. This poll "can hardly be regarded as a truly scientific, impartial test. The methodology, the questions, the tabulations, and all the other factors which do or do not impart reliability to a poll, were entirely outside the control of anyone but * * * [proponent's] agents." *Dowd v. Calabrese, supra* at 432. Reliability cannot be determined solely by counting scientific noses. *United States v. Williams,* 583 F.2d 1194, 1198 (2d Cir. 1978). Petitioners argue that the polygraph examination results in this case meet the *Frye* criteria as shown by the testimony of expert witnesses, Drs. Frank Horvath and Stanley Abrams for petitioners and Dr. William Iacono for respondent. The experts estimated a range of polygraph accuracy from 51 to as high as 98 percent, depending on a wide variety of factors. Petitioners argue that there was substantial agreement between all experts who testified as to the general reliability of polygraphy, thus meeting the *Frye* standard. We disagree. Likewise, petitioners read too much into Dr. Iacono's affirmative response to their question on cross-examination: "In other words, is it [polygraphy] a tool that could be used in determining with some degree of reliability truth or deception?" As an example of usefulness, Dr. Iacono said that a polygraph examination may induce some people to confess to wrongdoing. Dr. Iacono also said that the accuracy of a polygraph test is based on faulty theoretical assumptions. The faulty assumptions are: (1) The examiner can formulate questions that the examinee will answer deceptively; (2) all innocent examinees will be more disturbed by the control than by the relevant questions; (3) all deceptive examinees will be more disturbed by the relevant than by the control questions; and (4) polygraph testing is objective.

Petitioners argue that the widespread use of polygraph examinations by government agencies and business shows they are reliable. We disagree. We do not believe that widespread use of polygraph testing in business and government shows that polygraph testing enjoys general acceptance by the relevant scientific community. Instead, we believe there continues to be a bona fide debate in that community about polygraph accuracy. Therefore, we conclude that petitioners have not shown us that results of polygraph examinations

are sufficiently established to have gained general acceptance in the relevant scientific community.

Expert testimony must be relevant. Fed. R. Evid. 401. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. Petitioners argue that polygraph results are more reliable than not, and thus are relevant under rule 401 of the Federal Rules of Evidence. However, not all relevant evidence is admissible. For example, even though relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403. "[P]olygraph evidence should not be admitted, even for limited purposes, unless the trial court has determined that the 'probative value of the polygraph evidence outweighs the potential prejudice and time consumption involved in presenting such evidence.'" *United States v. Miller,* 874 F.2d 1255, 1261 (9th Cir. 1989) (quoting *Brown v. Darcy,* 783 F.2d 1389, 1397 n.14 (9th Cir. 1986)). Since we conclude that the *Frye* standard is not met and that the polygraph tests are not admissible under rule 702 of the Federal Rules of Evidence, we need not decide whether they are also inadmissible under rule 403 of the Federal Rules of Evidence.

## 2. *Unilateral Polygraph Testing*

Even if polygraph testing were generally accepted in the appropriate scientific community, the results here would be inadmissible. That is because petitioners arranged unilaterally to take the polygraph tests without informing respondent. Mr. Wasser concluded the test showed petitioners' cash hoard claim was truthful. Petitioners then reported the results to respondent. While results of polygraph tests may be admissible by stipulation of the parties, admission of polygraph tests administered unilaterally are not admissible. *Wolfel v. Holbrook,* 823 F.2d 970, 972 (6th Cir. 1987); *Barnier v. Szentmiklosi,* 810 F.2d 594, 596-597 (6th Cir. 1987); *Poole v. Perini,* 659 F.2d 730, 735 (6th Cir. 1981); *Dowd v. Calabrese, supra* at 431; *State v. Dean,* 103 Wis. 2d 228, 307

N.W.2d 628 (1981). But see *United States v. Piccinonna,* 885 F.2d 1529 (11th Cir. 1989).

In *United States v. Tucker,* 773 F.2d 136, 141 (7th Cir. 1985), in explaining a refusal to admit results of a lie detector test not agreed in advance to be admissible, the court said:

The lie detector does not peer into the mind; it is a test of (relative) anxiety, and if the person taking the test has nothing to lose and everything to gain, he may not be anxious and his passing the test may prove nothing. Whatever the force of this doubt, it is readily allayed by agreeing to allow the government to put the test results, whatever they may be, into evidence if it wants; and a defendant who refuses to make such an agreement is in a poor position to challenge the district court's exercise of its discretion to refuse to admit the results.

Similarly, the court in *Dowd v. Calabrese, supra* at 433, said: "One of the important factors that many of those who rely on polygraphs insist on is that the individual taking it should know that something real is at stake. Absent such conditions no results of significance can be expected." (Fn. ref. omitted.)

Finally, in *State v. Dean,* 307 N.W.2d at 637, the court said that a stipulation to admit results of polygraph tests:

encourages discussion and eventual agreement with regard to not only the general subject of the reliability of polygraph testing but also more specific subjects such as the qualifications required of the examiner, the designation of the examiner, the phrasing of the test questions, and the specification of the conditions under which the test is to be given.

We note that the U.S. Court of Appeals for the District of Columbia has recently said that *Frye* involved a criminal trial, and declined to decide whether *Frye*'s "general acceptance" requirement should be limited to criminal cases, and a less demanding standard, such as "substantial acceptability" applied in civil cases. *Kropinski v. World Plan Executive Council-U.S.,* 853 F.2d 948, 956 (D.C. Cir. 1988). However, we would not admit results of unilateral tests such as petitioners arranged here under either standard.

We conclude that the results of the polygraph examinations of petitioners are not admissible. We need not decide whether the procedures used in the actual examinations of petitioners were reliable.

Upon due consideration of the foregoing,

> *Results of petitioners' polygraph examinations will not be considered by the Court in the disposition of this case.*